Argued October 16, 1958, affirmed in part reversed in part
January 14, petition for rehearing denied February 11, 1959

DANIEL ᴇᴛ ᴀʟ *v.* DONOHUE ᴇᴛ ᴀʟ

SCHWABE, Aᴅᴍɪɴɪsᴛʀᴀᴛᴏʀ ᴇᴛ ᴀʟ and OXLEY ᴇᴛ ᴀʟ

333 P. 2d 1109

*Nicholas Jaureguy* and *Denton G. Burdick, Jr.,* of Portland, argued the cause for defendants-respondents. With Nicholas Jaureguy on the brief were Carter, Cameron & Carter, and Cake, Jaureguy & Hardy, all of Portland.

*Peter A. Schwabe* and *Wilber Henderson,* of Portland, argued the cause for defendants-appellants, Peter A. Schwabe, Administrator, et al. With them on the brief were Parker & Duffy, and Krause, Evans & Lindsay, all of Portland.

*Don S. Willner,* of Portland, argued the cause for defendants-appellants John J. Gallinagh et al. With him on the brief were William J. Crawford and Thaddeus W. Veness, of Portland, and John F. X. Browne and Emanuel Luria, of New York City, New York.

Black, Kendall & Fain, and Harry Hollis Daniel, of Portland, appeared on the brief for respondent Trustees.

O'CONNELL, J.

In this suit we are called upon to construe the will of Mary C. Vogt. More specifically we are asked to

decide which of the blood relations of the testatrix and her mother are to be included within a class designated by the testatrix as the "blood relations of my deceased mother and myself." The same will was before this court for construction in *Heilig v. Daniel et al.*, 203 Or 123, 275 P2d 854, 278 P2d 988 (1955). In that case the court expressly reserved the specific problem of construction which is raised in the present appeal.

Mary C. Vogt died on July 17, 1935, leaving a will which she had executed on August 16, 1934. The will was duly probated. We are concerned with the fourth paragraph of this will, which reads as follows:

"FOURTH: I give devise and bequeath unto my Brother-in-law, John Vogt, of Portland, Oregon, and unto Harry Daniel, of Portland, Oregon, all my property and estate of which I die seized, whether real, personal or mixed, in trust however, for my Daughter Lucile Vogt Heilig, the terms of said trust being as follows: (a) Out of the principal and income from my estate, John Vogt and Harry Daniel, shall use as much thereof as they deem necessary for the proper support of my said Daughter Lucile Vogt Heilig, during her lifetime, and upon the death of my said Daughter, then one-half thereof to the heirs of her body or the survivors of them share and share alike, (b) If no survivors of the heirs of the body, the income and the remaining portion of my estate to be divided by said trustees, equally and share and share alike among the blood relations of my deceased mother and myself."

Lucile Vogt Heilig died intestate without issue on November 28, 1951. By its terms the trust terminated upon Lucile Heilig's death. Thereafter the trustees filed this suit to determine who was entitled to the assets of the trust. The trial court decreed a distribu-

tion of the trust estate to the testatrix's six first cousins who survived the life tenant, Lucile Heilig. The descendants of the other first cousins of the testatrix appeal from that decree.

To see the relationship between the various parties, we begin with Daniel Donohue. He died in Ireland in 1881, survived by his children, Patrick, Anne, Bridget Donohue Carle and Margaret Donohue Brady. Anne died unmarried in 1902. Margaret Donohue Brady died on May 29, 1918, leaving as her sole heir Mary C. Vogt, the testatrix and mother of Lucile Heilig, the life tenant under the testatmentary trust which is before us for construction. As already stated, Lucile died without issue.

Bridget Donohue Carle died in 1914, survived by two daughters, Helen Carle Oxley, who died in 1932, and Margaret Carle Gallinagh, who died in 1918. Both of these daughters left issue.

Daniel's son Patrick was more prolific. He was survived by the following children, James, Daniel, Margaret Donohue O'Sullivan, Kate Donohue Reilly, Rose Donohue Conlon, Mary Donohue Campbell, Anne, John, Thomas, Andrew, Christopher and Bernard.

Four of the fourteen first cousins of the testatrix died before the testatrix executed her will. They were Helen Carle Oxley, Margaret Carle Gallinagh, daughters of Bridget, and Mary Donohue Campbell and Margaret Donohue O'Sullivan, daughter of Patrick. Each of them left issue. These issue claim a part of the trust estate. This category of claimants is referred to hereinafter as Group I.

Of the remaining ten first cousins who survived the testatrix, four predeceased Lucile Heilig, the life tenant. They were James Donohue, Daniel J. Donohue, Kate Donohue Reilly, and Rose Donohue Conlon. All

were children of Patrick and all left issue. These claimants are denominated Group II hereinafter.

The remaining six first cousins, also all children of Patrick, survived the life tenant Lucile Heilig. We describe them as Group III. The trial court held that this group of claimants was entitled to the estate to the exclusion of the other claimants in Groups I and II.

In *Heilig v. Daniel et al.,* supra, it was held that the trust was created to exist only during the lifetime of Lucile Heilig; that if she had died leaving heirs of her body, one-half of the estate would have vested in such bodily heirs and the other one-half would have passed by intestate succession to the heirs of the testatrix; that Lucile Heilig having died without heirs of her body, the estate vested in the blood relations of the testatrix and her mother not later than upon the death of Lucile Heilig, the court expressly reserving for later decision the question as to whether the estate vested upon the death of the life tenant or at some other time.

We construe the trust as creating an equitable estate for life in Lucile Heilig, followed by contingent remainders. The contingent remainder to the heirs of the body of Lucile embraced only one-half of the estate. This remainder was contingent because it was not known whether Lucile would have issue, or if she did, whether they would survive her.

The remainder to the blood relations of the testatrix and her mother also was contingent, there being three conditions precedent to its vesting, viz: (1) the death of Lucile without leaving surviving issue, (2) her death without exhausting the trust estate, (3) the existence of blood relations as hereinafter defined.

It is to be observed, then, that we are not presented

with the question of whether the estate vested at the death of the life tenant or at the death of the testatrix; it is clear that the remainders could not vest before the death of Lucile Heilig. Rather, we are called upon to decide which of the blood relations are the contingent remaindermen. Stated in another way, we must determine which of the blood relations of the testatrix and her mother constitute the members of the class in whom the remainder will vest if the conditions precedent are satisfied. Is the class to be determined as of the death of the life tenant (in which case the class would consist of Group III) or is it to be determined as of the death of the testatrix (in which case the class would consist of Groups II and III), or does the class include other blood relations who predeceased the testatrix or the descendants of such persons (in which case the class would consist of Groups I, II and III)?

The will provides that in the event that the trust objects fail, the alternative remainder is to vest in "the blood relations of my deceased mother and myself."

In *Heilig v. Daniel,* supra, it was decided that this quoted clause did not embrace all of the blood relations of the testatrix and her daughter and therefore the gift over was not void for indefiniteness. Who, then, is intended to be benefited? The general rule is that when a limitation is in favor of the testator's "blood relations," then, in the absence of language or circumstances indicating a contrary intent, the class is made up of those persons related to the testator by consanguinity who would take under the appropriate descent statute. *In re Estate of Miller,* 117 Or 399, 402, 244 P 526; Restatement, Property, § 307; Thompson on Wills, 3d ed, § 281; Page on Wills, 3d ed, § 1030.

The next of kin of Mary C. Vogt were the ten first cousins who survived her, which group we have described above as Group II. ORS 111.020, 111.030. They would constitute the class unless a contrary intent is shown.

In the present case the gift is not simply to the testatrix's blood relations but to "the blood relations of my deceased mother and myself." Those defendants who constitute Group I contend that this limitation, considered in the light of the circumstances attendant upon the execution of the will, indicates an intent to designate a class not confined to those who would be testatrix's next of kin under the descent statute, but a larger group including within it four first cousins who predeceased her or such of their descendants as would be alive on the date of distribution. Alternatively it is urged that if it is found that no direct gift was made to the descendants of the four cousins who predeceased the testatrix, they are entitled to take by virtue of the anti-lapse statute. To sustain this position a variety of arguments are advanced, all of which are designed to prove that the testatrix had the necessary "contrary intent" which takes the case out of the general rule confining the possible takers under the will to those who survive the testatrix.

The testatrix's use of the term "blood relations" is adverted to as evidence of her intent to include within the class persons other than her heirs, i.e., those who would survive her. It is argued that the words "blood relations" are to be construed "in their natural meaning and ordinary sense" and that the term should, therefore, include the first cousins who predeceased the testatrix or their descendants. The fact that the testatrix could have used the word "heirs" instead of the term "blood relations" and in fact did so in another

part of the will, is pointed to as evidence of an intent to include persons other than testatrix's heirs. It is pointed out that the blood relations of two persons, which was the form of the gift in the instant case, embraces a class which is different than the class consisting of the heirs of one person.

Finally, the defendants in Group I take the position that since the term "blood relations" as used in Mary Vogt's will is ambiguous, we must look to extrinsic evidence to arrive at her intent. In support of this argument these defendants marshal specific instances in which the testatrix or her mother indicated affection for some of the relations included in Group I. This evidence may be summarized as follows:

Testatrix's mother, Margaret Donohue Brady, and Margaret's sister, Bridget Donohue Carle, came to the United States from Ireland together. Margaret went to Portland and married Matthew Brady, and out of that union the testatrix, Mary Vogt, was born. Bridget settled in New York City and became Bridget Donohue Carle. She had five children. Only two of these children were survived by issue. These two were Helen Carle Oxley and Margaret Carle Gallinagh. Their issue constitute a part of Group I. The rest of Group I is made up of the descendants of two of Patrick's daughters, Mary Donohue Campbell and Margaret Donohue O'Sullivan.

Around 1910 the testatrix, her husband and the daughter Lucile, who was then about nine years old, took a trip to New York probably to visit the testatrix's relations. During a part of this visit the Vogts lived near the Gallinagh and Oxley homes. From the testimony of Mabel Oxley Hopkins, Helen Carle Oxley's daughter, we learn that the Vogt and Oxley families were close; that they frequently visited each other,

had meals together, went to Coney Island together, and generally indicated warm friendship and affection for each other. From the testimony of John and Emily Gallinagh, children of Margaret Carle Gallinagh, we learn that the Gallinagh and Vogt families were on friendly terms. During the Vogt's visit to the east coast Emily stayed with the Vogts for a few days. When the Vogts left they gave Emily some of Lucile's clothes. John called Mary Vogt "Aunt Mamie" and she called him "Jack." Mary visited the Gallinagh home at least once. She addressed Margaret Gallinagh as "Maggie." It was John's impression that the testatrix was on "very friendly" terms with her cousins in New York. John corresponded with the testatrix from time to time. She addressed him "Dear Jack" or "Dear Cousin Jack." In an unmailed letter to John, found at her death, she referred to "Dan Donohue, your cousin and mine." She sent John a small cash gift when he was married, and in 1927 she asked him to move to Portland to help her with a construction project which she had undertaken.

About one year after the Vogt visit, Margaret Donohue Brady, the testatrix's mother, went to New York at which time she stayed at the Oxley home, where her sister Bridget was living. This was the first time in forty years that Margaret and her sister Bridget had met, and the meeting was a joyful one. Margaret gave money to Bridget on this visit. John Gallinagh remembered meeting Margaret then but there is no other evidence of contact with the Gallinaghs. Margaret called on one of Patrick Donohue's daughters. She is not identified in the record and it is possible that she may have been one of the persons in Group III.

Not long after these two visits by the testatrix and

her mother, Emma Carle McCoy, a daughter of Bridget, visited the Vogts in Portland, staying about one month. Emma died before the testatrix, without heirs, but her visit is recited by the Group I defendants as additional evidence of Mary Vogt's general affection for the Carle children. John Gallinagh testified that Emma told him that Mary had sent $200 to her for the expense of the trip to Portland.

The foregoing constitutes the substance of the evidence concerning the affection that Mary Vogt and Margaret Brady had for the blood relations in Group I.

There is some evidence of their attitude toward other blood relations. It is as follows: In 1904 Daniel Donohue (through whom some of the defendants in Group II claim) came to Portland from the east at the invitation of Margaret Brady, apparently for the purpose of helping Margaret conduct her affairs. Daniel became a permanent resident of Portland and kept in close touch with both Margaret Brady and Mary Vogt. The evidence shows that Mary regarded Daniel and his children with affection.

There is also evidence relating to two of the Group III claimants. In 1914 John Donohue, one of the plaintiffs, spent six weeks in Portland as a guest of Mary Vogt. At the time of his visit he was given a post card upon which was a photograph of Margaret Brady and her granddaughter, Lucile Vogt, later to become Lucile Heilig. After the visit, John Donohue received a friendly note from Lucile, who was then eleven years old. The other evidence relating to a Group III claimant is a letter from Mary Brady to Bernard Donohue, one of Patrick's sons. Bernard, who resided in Ireland, had written to Mary, asking for twenty pounds to pay for his passage to America. In a friendly letter, Mary refused the request, explaining that she did not

have the money to spare. She reminded Bernard that her mother Margaret had given Bernard's father, Patrick a large sum of money to purchase land adjoining his farm.

Principally upon the basis of the foregoing evidence of the testatrix's affection for her blood relations in all three groups, the Group I claimants contend that testatrix intended to include all of her first cousins or their descendants as the objects of her bounty. It is also argued that at the time the will was executed there was little likelihood that Lucile, who was of the Catholic faith, and at the time separated from her husband, would remarry and have heirs of her body, and therefore the testatrix must have known that the gift over would very probably take effect. All of this is urged to rebut the constructional preference based upon the assumption that a testator intends to dispose of his estate to those who constitute the class at the time of his death. *Gerrish v. Hinman,* 8 Or 348 (1880); Restatement of Property, § 308; Page on Wills, 3d ed, § 299; Annotation, 49 ALR 174, supplemented in 127 ALR 602, 169 ALR 207.

The claimants in Group I present us with a choice of treating the expression "blood relations" as (1) descriptive of persons whom the testatrix intended to individualize at the time she made her will, or (2) as an amorphous group which would crystallize only upon the death of the testatrix when her will had a dispositive effect, or at some later date if survival to that date was imposed as a condition. It is to be noted that out of this large band of relations the evidence adduced by the claimants in Group I relates to but a small portion. There is no evidence of any significance relating to the attitude of the testatrix or her mother toward Mary Donohue Campbell and Margaret

Donohue O'Sullivan or their issue, who are included in Group I. Further, there is no evidence as to how the testatrix and her mother regarded three of the first cousins or their issue in Group II; and in Group III no evidence was presented relating to three of the claimants. It is quite possible that many of these relations were unknown to the testatrix. It is difficult to believe that she had these persons in mind when she made her will. It is more reasonable to assume that gift over was an "end limitation" which was "employed to indicate that the conveyor has exhausted his specific desires by previous limitations and is now ready to let the law take its course." 3 Powell, Real Property, § 372, p 196; American Law of Property, Vol V, § 22.1, p 240.

■ At the time Mary Vogt executed her will in 1934, Helen Carle Oxley had been dead two years, Margaret Carle Gallinagh 16 years, Mary Donohue Campbell one year, and Margaret Donohue O'Sullivan 31 years. Mary's visit to New York had been made more than 20 years before she executed her will. There is very little evidence of any direct interest in any of the descendants of these four first cousins except John J. Gallinagh. We would have to assume that because of her affection for two of the first cousins who predeceased her she intended to benefit all of the descendants of all of the first cousins who predeceased her. We think that the evidence is not strong enough to warrant this inference. Had she intended to benefit the descendants of those for whom she had exhibited affection it would seem that she would have designated them as beneficiaries in her will. Under any of the interpretations of the term "blood relations," as used in Mary Vogt's will, some of the persons who would benefit were strangers to her. This would lend sup-

port to the hypothesis that the gift over was a general direction to distribute her estate in accordance with the descent statute and that it was not a specific direction to divide the estate among relations whom the testatrix had in mind as a definite group of persons existing at the time of the execution of her will. Further, it is to be observed that under the will, if Lucile had been survived by issue, one-half of the estate would have gone by intestacy, which would have excluded all of the claimants in Group I. *Heilig v. Daniel,* supra. If the testatrix had no concern for such claimants as to one-half of the estate in the event that Lucile died with issue (which we could assume from the conclusion reached in *Heilig v. Daniel,* supra, that there was an intestacy as to this part) it is not unreasonable to conclude that she had no greater concern for them in disposing of the remainder of her estate if Lucile died without issue.

■ There is no evidence which throws light upon the testatrix's purpose in limiting the gift to the blood relations of both her mother and herself. It is possible that she did it for the purpose of excluding the heirs of her father, Matthew Brady. The Group II claimants contend that the phrase was used to exclude Lucile Heilig from the class of remaindermen. This conclusion is reached on the reasoning that Lucile was a blood relation of Matthew Brady and it was the intent to exclude all those who had in their veins the blood of Matthew Brady. This is a strained construction. It is not unlikely that the reference to her mother's relations was Mary Vogt's way of referring to the large class of persons related to her which she knew most about—the Daniel Donohue side of the family—in whom Margaret Brady would have a natural interest, being the sister of Bridget and Patrick. This does not

mean, as the claimants in Group I argue, that the testatrix therefore had the intent to regard the relations in this group as a band of beneficiaries. We construe the term to mean the next of kin of the testatrix on the maternal side of her family.

■ The Group I claimants attach significance to the fact that the testatrix used the words "heirs" in one part of the will and "blood relations" in another part, it being argued that this indicates that the testatrix did not intend to use the latter phrase to describe her next of kin. We do not agree with this interpretation. We think that it would be perfectly natural for the testatrix to describe Lucile's issue by using the expression "heirs of her body," and thereafter describe her next of kin by the expression "blood relations."

The fact that the will directed the remainder to be divided "equally" and that the blood relations were to "share and share alike" is adverted to as evidence of testatrix's intent to reject the requirement of survivorship to the time of her death. But the adjudicated cases are to the contrary. American Law of Property, Vol 5, § 22.7, page 261. The holding of these cases is summarized by Casner, Class Gifts—Effect of Failure of Class Member to Survive the Testator, 60 Harv L Rev 751, as follows:

> "* * * The fact that the gift is to the class "share and share alike" or "equally" has been held insufficient to individualize the beneficiaries and deprive the members of the group who survive the testator of their right to the entire subject matter of the gift."

It is our conclusion that the testatrix intended to create an interest in those of her next of kin who were also blood relations of her mother. Having so construed the will, it is not necessary for us to consider

the contention that our anti-lapse statute, ORS 114.240, is applicable.

■ We turn then to a consideration of the respective claims of the blood relations in Groups II and III. Both groups of claimants recognize the general rule that a devise to a class "takes effect in favor of those who constitute the class at the death of the testator unless a contrary intent can be inferred from some particular language of the will or from such extrinsic facts as may be entitled to consideration in construing its provisions." *Gerrish v. Hinman*, 8 Or 348, 350; Page on Wills, 3d ed, § 1052; Thompson on Wills, 3d ed, § 299; 3 Restatement of Property, § 308. The Group III claimants contend that such "contrary intent" is present in the case at bar. They point to a number of factors evidencing testatrix's intent to limit the gift over to those members of the class who survived Lucile Heilig, the life tenant. It is argued that if the class is to be determined at the death of the testatrix, the effect of the gift would be to create both a life estate and a remainder in fee in Lucile Heilig, for at the death of the testatrix Lucile would be her sole heir, and therefore the remainderman; that because a life estate was specifically created in Lucile it is incongruous to treat the limitation in favor of the "blood relations" as creating a remainder in her; and that to avoid this construction the limitation should be construed as postponing the determination of the class until Lucile's death.

Where a life estate is given to a person who would be the sole taker under the class gift if the class were determined at the testator's death, the cases are in conflict, some holding that the class is determined as of the time of the testator's death, whereas others postpone the ascertainment of the class to the end of

the life estate. 3 Powell on Real Property, § 375; Simes and Smith, The Law of Future Interests, § 735; American Law of Property, Vol V, § 22.60. If the testator's death is chosen as the time at which the class is determined, some cases have held that the remainder vests in the life tenant, creating in him a fee simple estate, whereas other cases have held that the class consists of those who would be the heirs of the testator if the life tenant had predeceased him. Simes and Smith, supra, § 735.

■ It is to be borne in mind that the rules we are dealing with here are simply rules of construction designed to carry out the testator's intent. The adjudicated cases must be appraised with this in mind. So viewed, the following statement from 3 Powell on Real Property, § 375, P 227, concisely summarizes these rules:

> "A multitude of decisions hold that the single fact that the life tenant is A's [testator's] sole heir is not alone enough to postpone the time for the picking of A's heirs to a later date. But there is another multitude of decisions in cases where this life-tenant-sole-heir factor is present, in which the date of ascertainment has been postponed to the death of the life tenant. Some of these cases are undoubtedly inconsistent with the first 'multitude.' It is believed, however, that the vast majority of them are really consistent with the first multitude, because in them the life-tenant-sole-heir factor is accompanied by other factors sufficient to require the postponement."

We find insufficient evidence in the case at bar to indicate an intent on the part of Mary Vogt to postpone the ascertainment of the class until Lucile's death. It does not seem reasonable to ascribe to the testatrix the intent to create a remainder in Lucile Heilig in

addition to her interest as life beneficiary under the trust. In *Heilig v. Daniel,* supra, it is assumed that Lucile was entitled to a life estate only. If Lucile Heilig is not one of the remaindermen, then the class consists of the next of kin other than Lucile. The fact that we treat the remainder as inuring to such blood relations does not mean that we must determine the class at the time of Lucile's death. As already stated, there is no evidence to show that the testatrix intended to postpone the determination of the class until that time. Absent such evidence it is reasonable to assume that it was intended that upon the occurrence of the conditions precedent the gift over would vest in those blood relations who were within the class at the time the will went into effect upon the death of the testatrix. This accords with the general rule alluded to above, that the heirs or next of kin of the testator are to be determined at his death in the absence of evidence that a different time was intended. Excluding Lucile as a remainderman, the class consists of the ten first cousins of the testatrix living at her death.

There is a respectable body of authority which supports the conclusion that although the life tenant comes within the description of the class designated to take by way of remainder, he may be excluded from the class, not by postponing the ascertainment of the class until after his death, but by treating the class as formed at the testator's death and excluding the life tenant from it. *St. Louis Union Trust Co. v. Kaltenbach,* 353 Mo 1114, 186 SW2d 578 (1948); *Abbott v. Danforth,* 135 Me 172, 192 A 544 (1937); *Re Carter's Will,* 99 Vt 480, 134 A 581, 61 ALR 1005 (1926); and other cases collected in 30 ALR2d 393, 435.

In most of these cases an effort is made to point to particular language in the will or to some circumstance

attendant upon the execution of the will to establish that the class, excluding the holder of the precedent estate, was intended to be formed at the testator's death. It would be possible for us to point to such language and circumstances in the case at bar, but we prefer to rest the decision on the ground that the class is determined at the death of the testatrix in the absence of evidence of a contrary intent and that such evidence is not present in the case before us. We are of the opinion that the testatrix did not intend to include Lucile Heilig as a member of that class.

It is significant that the testatrix did not *expressly* provide that only those blood relations who survived the life tenant should be entitled to the remainder. When survivorship is intended it is very common for testators to add a condition limiting the gift to the persons "surviving" or "then living" or "living at the death of the life tenant," or similar expressions. The fact that no such provision was added by the testatrix in this case is some evidence that she did not intend to attach the condition of survivorship to the gift over. See *Duncan v. De Yampert et al.,* 182 Ala 528, 62 So 673 (1913); *Allen v. Maxwell,* 249 Ala 655, 32 So2d 699 (1947).

The claimants in Group III attach significance to a statement made in Volume V, American Law of Property, § 22.60, page 446, to the effect that if the class is not ascertained at the death of the life tenant who is the sole heir, "the property may pass out of the blood of the ancestor before the period of distribution." The answer to this "explanation" of the result in some of the decided cases can be found in the same treatise in Section 22.59, pages 426-427. There, in commenting upon the cases construing gifts to "relatives" and the like to mean "blood relatives" so that the sub-

ject matter of the gift does not pass out of the testator's blood, it is said:

"Again the writer feels that these courts are not being realistic as to the attitude of mind that prompts the average testator to describe his beneficiaries by such terms, since these gifts are usually made after the testator has exhausted his specific desires."

The Group III claimants argue that because the gift over to the blood relations is subject to the conditions that Lucile leave no surviving heirs of her body and that the trust estate is not exhausted at Lucile's death, there should be implied a requirement that members of the class be determined at the time these contingencies are resolved. In other words, it is argued that a condition precedent of survivorship may be implied from the fact that the gift is contingent in other respects. Cases can be found which support this contention. See, 169 ALR 207; 127 ALR 602; 49 ALR 174. However, the prevailing and better rule is to the contrary. This rule is stated in Restatement of Property, § 261. In the comment appended to that section it is said:

"The rule stated in this Section would be almost too obvious for statement if it were not for the erroneous view, often expressed in cases concerning class gifts, that the members of the class necessarily remain subject to the condition precedent of survival so long as the ultimate ascertainment of the class is postponed by another defeasibility or condition precedent of such gift [compare § 296(2) and Comment j thereunder]."

The view expressed in the Restatement is supported by the textwriters. Simes and Smith, The Law of Future Interests, §§ 594, 655; 3 Powell on Real Property, § 334. We accept it as the rule in Oregon.

■ Next it is contended that the use of the plural word "relations" is an indication that the testatrix did not intend to limit the remainder to the life tenant alone, but rather intended to include other blood relations who, it is urged, should be ascertained at the life tenant's death. 49 ALR 174, 191. The reliance upon the use of the plural words "relations," "heirs," and similar words, as a basis for establishing the time when the class is ascertained has been described as grasping at "feeble straws." 3 Powell on Real Property, § 375, P 229. We agree. In attempting to derive Mary Vogt's intent as to the persons who were to benefit, we do not regard as significant her use of the word "relations" in the plural.

■ The use of the word "then" preceding the limitations creating the alternative remainders is relied upon as evidence of the testatrix's intention to postpone the ascertainment of the class. The plaintiffs contend that the word "then" is used in the will as an adverb of time. This is not a gift to Lucile for life and upon her death to the persons who are *then* the blood relations of the testatrix and her mother; it is a gift to Lucile for life and upon her death *then* to the remaindermen. The word "then" is used here merely to indicate when the remaindermen are entitled to possession. The word has been generally so construed in similar cases. American Law of Property, Vol V, § 22.60, p. 439.

■ The direction in the will that the estate is "to be divided" by the trustees in the event that the gift over takes effect is relied upon by the plaintiffs as additional evidence of the testatrix's intent to postpone the ascertainment of the class until the death of Lucile Heilig. In effect, the plaintiffs urge us to adopt the so-called "divide and pay over rule" under which the

direction to divide or pay at a future time is regarded as indicative of an intent to require the members of the class to survive until the gift becomes possessory. A majority of the courts do not accept this rule of construction. The prevailing rule is stated in 3 Restatement of Property, § 260, as follows:

"In a limitation purporting to create a remainder of an executory interest, the fact that the only words of gift to the intended taker thereof consist of a direction to divide and pay over, or to convert, divide and pay over, at the end of the created prior interest or at some other future date is not a material factor in determining the existence of a requirement of survival to the date of distribution." 3 Restatement, Property, § 260, p 1312.

The divide and pay over rule is universally criticized by the textwriters. Simes and Smith, The Law of Future Interests, §§ 593, 657, 658; 2 Powell on Real Property, § 333; American Law of Property, Vol V, § 21.21. We expressly reject it. Therefore we attach no significance to the fact that the trustees in the case at bar were directed to divide the estate upon the death of the life tenant without heirs of her body.

In summary, it is our conclusion that the "blood relations" entitled to take under the will are those first cousins of Mary Vogt who were living at her death. The descendants of those of her first cousins who predeceased her are excluded because there was not sufficient evidence of her intent to include them as beneficiaries under her will, and in this respect the decree of the trial court is affirmed. On the other hand, we do not find sufficient evidence that testatrix intended to exclude the four first cousins who were in existence at the time she made her will and who were living at the time of her death but who failed

to survive Lucile Vogt. In this respect the decree of the trial court is reversed.

The shares of the prevailing claimants are as follows: Each of those comprising Group III, John Donohue (son of Patrick Donohue), Annie Donohue, Thomas Donohue, Andrew Donohue, Christopher Donohue and Bernard Donohue, is entitled to an undivided one-tenth interest. The one-tenth interest which James Donohue, Daniel J. Donohue, Rose Anne Donohue Conlon and Kate Donohue Reilly each would have enjoyed had they survived the life tenant passes to their respective successors in interest. These are the persons who make up Group II.

The decree of the lower court will be modified in accordance with this opinion. Each of the parties shall bear his own costs.