# HENDERSON *v.* STATE TAX COMMISSION

Wilber Henderson, Portland, argued the cause for plaintiff.

A. W. Pedersen, Assistant Attorney General, Salem, argued the cause for defendant.

Remanded to commission, June 11, 1963.

PETER M. GUNNAR, Judge.

This is a suit to set aside the defendant's Opinion and Order No. I-62-22, assessing against the plaintiff in her fiduciary capacity additional state income taxes for the tax year 1959. It is tried in this court upon stipulated facts.

## FACTS

This case arises out of a factual situation which already has made two trips to the Supreme Court of this state. As found by the Supreme Court in the later decision, *Daniel v. Donohue*, 215 Or 373, 333 P2d 1109 (1959), at page 376, the facts are as follows:

"Mary C. Vogt died on July 17, 1935, leaving a will which she had executed on August 16, 1934. The will was duly probated. We are concerned with the fourth paragraph of this will, which reads as follows:

"'FOURTH: I give devise and bequeath unto my Brother-in-law, John Vogt, of Portland, Oregon, and unto Harry Daniel, of Portland, Oregon, all my property and estate of which I die seized, whether real, personal or mixed, in trust however, for my Daughter Lucile Vogt Heilig, the terms of said trust being as follows: (a) Out of the principal and income from my estate, John Vogt and Harry Daniel, shall use as much thereof as they deem necessary for the proper support of my said Daughter Lucile Vogt Heilig, during her lifetime, and upon

the death of my said Daughter, then one-half thereof to the heirs of her body or the survivors of them share and share alike, (b) If no survivors of the heirs of the body, the income and the remaining portion of my estate to be divided by said trustees, equally and share and share alike among the blood relations of my deceased mother and myself.'

"Lucile Vogt Heilig died intestate without issue on November 28, 1951. By its terms the trust terminated upon Lucile Heilig's death. Thereafter the trustees filed this suit to determine who was entitled to the assets of the trust. The trial court decreed a distribution of the trust estate to the testatrix's six first cousins who survived the life tenant, Lucile Heilig. The descendants of the other first cousins of the testatrix appeal from that decree.

"To see the relationship between the various parties, we begin with Daniel Donohue. He died in Ireland in 1881, survived by his children, Patrick, Anne, Bridget Donohue Carle and Margaret Donohue Brady. Anne died unmarried in 1902. Margaret Donohue Brady died on May 29, 1918, leaving as her sole heir Mary C. Vogt, the testatrix and mother of Lucile Heilig, the life tenant under the testamentary trust which is before us for construction. As already stated, Lucile died without issue.

"Bridget Donohue Carle died in 1914, survived by two daughters, Helen Carle Oxley, who died in 1932, and Margaret Carle Gallinagh, who died in 1918. Both of these daughters left issue.

"Daniel's son Patrick was more prolific. He was survived by the following children, James, Daniel, Margaret Donohue O'Sullivan, Kate Donohue Reilly, Rose Donohue Conlon, Mary Donohue Campbell, Anne, John, Thomas, Andrew, Christopher and Bernard.

"Four of the fourteen first cousins of the testatrix died before the testatrix executed her will.

They were Helen Carle Oxley, Margaret Carle Gallinagh, daughters of Bridget, and Mary Donohue Campbell and Margaret Donohue O'Sullivan, daughter of Patrick. Each of them left issue. These issue claim a part of the trust estate. This category of claimants is referred to hereinafter as Group I.

"Of the remaining ten first cousins who survived the testatrix, four predeceased Lucile Heilig, the life tenant. They were James Donohue, Daniel J. Donohue, Kate Donohue Reilly, and Rose Donohue Conlon. All were children of Patrick and all left issue. These claimants are denominated Group II hereinafter.

"The remaining six first cousins, also all children of Patrick, survived the life tenant Lucile Heilig. We describe them as Group III. The trial court held that this group of claimants was entitled to the estate to the exclusion of the other claimants in Groups I and II."

As noted in the foregoing excerpt, plaintiff's decedent, Daniel J. Donohue, survived Mary Vogt but predeceased Lucile Heilig, the life tenant. Daniel Donohue died intestate in Multnomah County, Oregon, on December 24, 1943, leaving as his heirs at law his widow, Margaret Mary Donohue, and his four sons and two daughters. On December 6, 1944, an administrator of his estate was appointed. This appointment was made, in part, because there were proceedings to quiet title to certain real property which were contemplated at the time of his death. Thereafter, on May 17, 1945, representations were made to the Probate Court of Multnomah County that there was no property belonging to the estate, and on that date the estate was closed.

The life tenant, Lucile Vogt Heilig, died on November 28, 1951, some eight years after Daniel Dono-

hue. Upon the death of Lucile Heilig, two proceedings were instituted for the determination of the interests of various parties in the trust estate left by Mary Vogt. The first proceeding, *Heilig v. Daniel,* was brought by the life tenant's husband and sole heir and later continued by his estate. It sought the declaration of the life tenant as the sole member of the class taking the remainder. This case went to the Supreme Court and is reported in 203 Or at 123, 275 P2d 854, 278 P2d 988 (1955). In its opinion, as modified, the Supreme Court held that the remainder vested "not later than upon the death of" the life tenant and that the life tenant was not a member of the class to which the remainder gift was made.

The second case, *Daniel v. Donohue,* commenced at approximately the same time, was a suit to construe the will of Mary Vogt to determine the class taking the remainder. In it the trustees of Mary Vogt's testamentary trust, as plaintiffs, joined as defendants all the possible heirs and blood relations of Mary Vogt and Lucile Heilig. It is from this case that the foregoing extended quotation of the factual findings is made. In substance, the court held (at page 379) that "[I]t is clear that the remainders could not vest before the death of Lucile Heilig." Further, it held that the class to which the remainder was devised was determined at the death of Mary Vogt, thereby including within the class the groups denoted in the foregoing quotation as Groups II and III.

At the time the second suit, *Daniel v. Donohue,* was filed, both Daniel Donohue and his widow had died and his six children remained as claimants of Daniel Donohue's interest. These six children, having been named as defendants, entered into a contingent

fee arrangement with certain members of the Portland bar to represent them in this second suit in the presentation of their claims as members of Group II. Under this contingent fee arrangement, if the case went to the Supreme Court, as it did, their counsel were to receive 40 per cent of the assets recovered on behalf of the six children.

The second suit, which was decided adversely to the children of Daniel J. Donohue in the circuit court, was brought to a successful conclusion in the Supreme Court (resulting in a modification of the circuit court decision), and this successful conclusion resulted in the recovery by the six children of the one-tenth share allocable to Daniel J. Donohue.

Upon this conclusion of the case of *Daniel v. Donohue,* the trustees were faced with the problem of making a division of the trust corpus. This corpus consisted primarily of the Lumbermen's Building, a substantial office building, in Portland. Apparently, the heirs did not desire distribution in kind. On the other hand, the trustees were unwilling to conduct a sale of the building under the terms of the will. The circuit court decree upon the mandate in *Daniel v. Donohue* recognized that title had vested in the remaindermen. Upon the entry of the circuit court decree, the sole surviving trustee delivered technical possession of the building (though he apparently continued to manage it for the trust until it was sold) and a sale then was conducted by the remaindermen.

At the insistence of the title insurance company, the estates of the various original members of the remaindermen class then deceased (Group II) were reopened or their probate was initiated. The Daniel J. Donohue estate, which had been closed in 1945, was reopened, with the plaintiff as the administratrix *de*

*bonis non.* In the various probate proceedings the necessary orders of sale were obtained and the sale of the building took place. The title insurance company, as escrow agent, made distribution of the sale proceeds to the respective estates, including that of Daniel J. Donohue, upon the receipt by it of an administratrix' deed. Upon the receipt by the administratrix of the proceeds of the sale, she paid the attorneys fees of 40 per cent and then, upon appropriate court order so to do, she distributed the bulk of, but not all, the funds remaining in the estate among the six children of Daniel J. Donohue.

In closing the estate, the administratrix represented to the State Tax Commission that the purpose of the reopening of the estate was to clear title to real property and that no income had been received by the estate. In reliance upon this understanding, a certificate of release for income taxes was issued and filed in the probate proceedings for all years after January 1, 1953. Subsequently, but before the estate was closed, the State Tax Commission revoked its certificate of release upon the basis that it had been misinformed as to the purpose of the probate proceeding, and on May 9, 1962, after an independent examination of the probate file, the commission assessed additional income taxes against the plaintiff for the year 1959 for the gain which they alleged that she had realized upon the sale of the Lumbermen's Building. The administratrix then petitioned the commission to set aside that assessment, and from its adverse decision this proceeding is brought.

## CONTENTIONS OF THE PARTIES

At issue in this case is the proper treatment for tax purposes of the attorneys' contingent fees incurred

by the Donohue heirs and paid by the Donohue estate. The defendant's additional assessment is based upon the alleged, realized gain taxable to the estate of Daniel J. Donohue upon the sale of the one-tenth interest in the Lumbermen's Building by the estate and the amount is computed by treating as the basis of that property in the hands of the Donohue estate one-tenth of the fair market value of the building at the date of death of Daniel Donohue, inventoried at $425,000. The sale price of the building in 1959 was $600,000, resulting in a gain of $175,000 to all the remaindermen under the commission theory. One-tenth of this amount is allocated to the Donohue estate and the plaintiff is assessed the tax upon this amount, plus interest and a 100 per cent penalty, all totaling $3,051.50. The assessment is based upon the state's contention that these fees were incurred by the Donohue heirs and not the estate, that they were moneys expended in asserting or protecting title to an interest in real estate and not for the protection of the income therefrom, and that "the expenditures incurred [by the Donohue heirs] became a part of the basis of the property [money] in the hands of the heirs to be reflected upon their individual income tax returns upon their subsequent disposition of said property."

The plaintiff makes two alternative, contrary contentions. First, she contends that the attorneys' fee was a lien upon the property when it came into her hands as administratrix and, therefore, should be a part of the basis of that property in her hands. Alternatively, she contends that the asset which came into her hands as administratrix was the net proceeds of the litigation, namely, the one-tenth interest in the building reduced by the attorneys' fee already incurred and a lien.

## NATURE OF THE INTEREST IN PROPERTY

The first known elements of this case are those decided by the Supreme Court. From the above-cited decisions we know that, upon the death of Mary Vogt, Daniel J. Donohue, as a member of a class which at that time opened (*Daniel v. Donohue, supra*) and closed (*Heilig v. Daniel, supra*), became the owner of a transmissible interest in the Lumbermen's Building. *Daniel v. Donohue, supra,* decided that this interest was a contingent remainder in an undivided one-tenth interest in fee simple subject to a life estate and that it became vested and noncontingent upon the death of the life tenant, Lucile Heilig. The Supreme Court did not expressly decide whether this interest was real property or personal property within the definitions in ORS 111.010, but the Circuit Court of Multnomah County, in its decree upon the Supreme Court's mandate, vested undivided one-sixtieth interests in the heirs of Daniel J. Donohue subject to the rights of the administratrix of Daniel Donohue's estate, rather than a one-tenth interest in the estate of Daniel J. Donohue, thereby apparently determining that this interest passed as real property rather than as personal property. Throughout this case counsel have so treated it.

This treatment of the interest as real property conforms with the law. ORS 111.010 in substance provides that estates of a duration of either the life of another or of fee simple are real property. It does not contemplate that the title thereto be vested as opposed to contingent, but rather includes not only "lands, tenements and hereditaments" but also "all rights thereto and all interest therein." The interest of Daniel J. Donohue was a remainder in fee simple subject to a life estate. His interest was contingent

rather than vested, but the contingent nature of his interest did not reduce the quantum of his estate to less than one for the life of another. It remained an estate in fee, even though the interest was contingent and possession was delayed.

■ Some question may be raised as to the real property nature of this interest in view of the provision of Mary Vogt's will that the trustees "divide" the property among the remaindermen "equally and share and share alike." In some states, the testamentary direction to divide has been held to require the trustees to sell the property before division. However, the better rule and that of the majority appears to be that the right of sale is discretionary in the trustees. Annos. 134 ALR 378; 23 ALR2d 1000. If the sale of the property before distribution were mandatory, the doctrine of equitable conversion would operate to convert the interest here in question to personalty. Since the power of sale is discretionary, this trust res remains realty. The determination that the power of sale was discretionary and that the interest was, therefore, real property is buttressed by the practical construction made by the trustees of their power of sale in this case, inasmuch as they refused to sell the building but rather distributed it in kind to the remaindermen.

Thus, at this point we have Mary Vogt dying and leaving to Daniel J. Donohue a contingent remainder real property interest of an undivided one-tenth of the Lumbermen's Building after the life estate of Lucile Heilig. Eight years later and before the termination of the life estate of Lucile Heilig and before the remainder became vested, Daniel died, leaving his widow and six children surviving. Since the contingent

remainder was a transmissible interest in realty, it passed to the six children, subject to the dower interest of their mother. The mother died before the death of Lucile and before the remainder vested, so that her interest terminated. Such interpretation conforms to the circuit court order vesting title in the six children without the probate of their mother's estate.

"By its terms the trust terminated upon Lucile Heilig's death." *Daniel v. Donohue,* supra, at 376. Upon Lucile Heilig's death without issue and with the building still in the trust, the six Donohue heirs held a vested, possessory interest in the building in fee simple, subject only to defeasance upon two conditions, either a sale by the trustees under their discretionary power of sale for distributive purposes or a sale in a reopened probate of their father's estate. The first contingency did not occur at all and the second contingency did not occur until about eight years later, during which time the attorneys' fees in question were incurred and earned. The nature of the interest as real property is material because this fact affects the lien and the nature of the interest of the attorneys before the completion of the delayed probate.

## NATURE OF ATTORNEYS' FEE OBLIGATION

■ After becoming vested with their remainder, the six Donohue heirs were forced to perfect, or more formally to defend, their title to their one-tenth interest by defending the suit of *Daniel v. Donohue, supra.* In order to pay the cost of this defense they agreed to the contingent fees here at issue. At the time that the fee agreements were made and the fees were earned, their father's estate had been probated and closed, they had been determined to be his heirs

in that probate, and the title to the remainder was in their names in fee simple. Under the terms of the attorney's lien statute, a lien for the fees attached to the property as the subject of the suit and this lien took priority over all encumbrances except taxes. ORS 87.495(2).

Only when the title of the six Donohues had been successfully defended and the attorneys' fees had been earned, was a sale of their interest attempted. At this point the title company insisted upon a sale by an administrator and for this administration *de bonis non* their father's estate was reopened. The sale of the interest then was made by the administratrix free of the attorneys' lien by an agreement with the attorneys that their lien would be satisfied out of the first proceeds of the sale. Upon receipt of those proceeds, the attorneys were first paid and then, upon an order of the probate court, a partial distribution was made to the Donohues.

## QUESTION OF CHARGE TO BASIS

Thus the question resolves itself to this: Were the attorneys' fees to the lien of which the property was subject at the time it was received by the estate and which were paid out of the sale proceeds properly a part of the basis of that property in the hands of the estate at the time of its sale?

Ordinarily, real property in the hands of the personal representative has as its basis the fair market value of that property at the date of death of the decedent. ORS 316.266; 316.810. Upon the sale of the property during administration, the estate and not the beneficiaries are taxable, even though distribution is made in the same tax year, unless the will (there

was none here) provides for current distribution of capital gains. ORS 316.815. Under this statute, the commission contends that the administratrix took the property at its basis at the date of death of Daniel Donohue. It concedes that, had the estate been re-opened immediately upon the death of the life tenant and the attorneys' fees incurred by the administratrix and paid during administration, the basis of the building would be properly adjustable by those fees for the computation of gain and loss upon sale. However, since the estate was not opened until after the litigation was won and the lien had attached, the commission contends that these fees do not adjust the basis in the hands of the estate because, though incurred after the death of the decedent, they were not incurred by the estate and that they rather are a capital adjustment, applicable to the proceeds of the sale of the building in the hands of the heirs by whom they were incurred and available to the heirs after the distribution. Such agreement might be more tenable if the interests of the Donohue children were personal property, as the lien of the attorneys' fees might not have attached to anything but the proceeds after probate. As it is, this question is moot here.

Our statute dealing with adjusted and substituted basis, ORS 316.270, is most broad. It provides in its material part:

"(2) Proper adjustment in respect of the property shall in all cases be made:

"(a) For expenditures, receipts, losses or other items, properly chargeable to capital account, but no such adjustment shall be made in respect to items for which deductions have been taken by the taxpayer on his tax returns for prior years made under this chapter or under the Property Tax Re-

lief Act of 1929, as amended, if the adjustment of such return is barred.

"* * * * *

"(4) Whenever it appears that the basis of property in the hands of the taxpayer is a substituted basis, then the adjustments provided in subsection (2) of this section shall be made after first making in respect of such substituted basis proper adjustments of a similar nature in respect of the period during which the property was held by the transferor, donor or grantor, or during which the other property was held by the person for whom the basis is to be determined. A similar rule shall be applied in the case of a series of substituted bases."

The only criterion for such adjustment to basis is that it be "properly chargeable to capital account." Thus our question is not did the estate incur the liability for the fees but rather were the fees properly chargeable to the capital account with respect to this building at the time of sale.

 To determine the propriety of the charge we must return to the problem of title. Obviously, a charge cannot be properly placed upon a capital asset by a stranger to its title. But the heirs were not strangers to the title to this property. When the estate of their father was closed in 1945, they became the owners of a contingent remainder. With the death of Lucile Heilig, they became the owners of the undivided interests in fee. The estate having been administered in 1945, they took this fee title, not subject to the condition precedent of a probate of their father's estate to determine heirship and for proper administration, but rather subject only to a remote condition subsequent of a possible reopening of his estate. In reality, the administratrix took her title,

not from the decedent, but rather by divesting the heirs. During the time that the heirs held the title, the lien of the attorneys' fees attached. It then was a proper charge to the capital account. When the administratrix took her title for the purposes of the sale, she was comparable to a buyer who purchased the property subject to the lien of the attorneys' fees. Normally, a buyer of property who assumes an encumbrance and then, upon resale of the property, pays off the encumbrance out of the proceeds of sale is entitled to add to his purchase price the amount of the encumbrance to determine his basis for gain or loss. 3A Mertens Law of Federal Income Taxation, § 21.11. Put another way, the basis of such buyer is his purchase price plus the mortgage assumed. Clearly, the fees are properly chargeable to the capital account because they contributed to the value of the capital, being the cost of perfecting title. This is true regardless of who incurred them, so long as they were incurred by one not a stranger to the title and were paid out of the sums realized upon the sale of the building or were paid prior thereto, or the buyer assumed them or bought subject to them.

Though it is easily confused with it, this case is not controlled by the rationale in *Crane v. Commissioner,* 331 US 1, 67 S Ct 1047, 91 L ed 1301 (1946). In the *Crane* case, the encumbrance did not add value to the property in question. The value of the property in the *Crane* case at the date of death was determined without reference to the mortgage or a diminution in its value on account of the mortgage. Therefore, the value would not have been altered or enhanced by its payment. In the instant case, the attorneys' fees contributed value to the property by establishing the doubtful title of the decedent. Nor is this

a case of the defense of title from a spurious claim which has given trouble to many people in justifying capitalization. The title of Daniel Donohue at his death was not clearly established. The litigation brought by the trustees was legitimately required for the proper disposition of the remainder of the trust estate. As evidenced by the circuit court decision, there was a substantial doubt as to the existence of any interest in Daniel Donohue. This doubt existed at his death and was disposed of only by the capital investment in the attorneys' fees here in question.

■ The general concept of capitalizing attorneys' fees incurred in litigation concerning title has come under some attack in the recent past. See Brookes, Litigation Expenses and the Income Tax, 12 Tax L Rev 241 (March 1957). However, this treatment of these fees goes back to 1916 in the federal cases and regulations and is of such long standing that it must be deemed part of our Oregon law under the terms of a statute as broad as ORS 316.270. *Ruth Realty Co. v. Tax Commission,* 222 Or 290, 294, 353 P2d 524 (1960). As recently as 1956, the United States Tax Court affirmed this principle in a case similar to this case, allowing the increase of basis on account of attorneys' fees incurred in defending a bequeathed title. *McEwan,* § 56,027, P-H Memo TC.

■ In substance, ORS 316.270 allows those adjustments to basis which are proper in the usual case. Within its contemplation are the basis adjustments generally allowed and made under the federal tax statutes. Such interpretation of this statute conforms with the established rule of construction:

"* * * And we entertain no doubt that decisions of federal courts touching upon matters in

tax areas common to the laws of each government are accorded a serious and persuasive consideration by the state legislature in order to attain such a harmony of construction for the benefit of the taxpayer when it can be done without sacrifice to the overall tax objectives of the state." *Ruth Realty Co., supra,* at pp 295-6.

The interaction of this rule of construction with a phrase as broad as "properly chargeable to capital account" would reasonably appear to justify the application of federal concepts of long standing prior to the adoption of the Oregon Income Tax Act in the interpretation of our act. Though this might be said to be a corollary to the rules of *Ruth Realty Co. v. Commission, supra; Pacific Supply Coop. v. State Tax Com.,* 224 Or 556, 356 P2d 939 (1960), and the other Oregon cases of the same general import, this court believes that it is a proper application or expansion of such rule.

■ Furthermore, any interpretation of the broad language of ORS 316.270 must recognize that neither this section nor the substituted basis section, ORS 316.266, requires that the capital investment which is the adjustment to basis be incurred by the taxpayer whose basis is being determined. In fact, ORS 316.270 (4) directs that, where there is a substituted basis as there is here, the taxpayer is entitled to apply to the basis the adjustments of his transferor as well as his own, applying the former first. As noted earlier, the administratrix *de bonis non* in this case received her title after it had vested for about eight years in the six Donohue children. While it was vested in them, they incurred the attorneys' fees in question which were a proper adjustment to the basis in their hands. Taking from them, all of them having the substituted

basis of Daniel Donohue, the administratrix was entitled to add the fees to her basis.

So to interpret our statute also conforms with the interpretation already given to it by the commission in its regulations. In its Reg. § 6.266(6), the commission has ruled that:

> "In the hands of every person who acquires the property of a decedent (or an estate or interest therein) by bequest, devise or inheritance, the basis of the property is always the same, whether such person be the executor or administrator, the heir, the legatee, the devisee, the trustee of a trust created by the will, or any beneficiary of such trust, and whatever the nature of any such person's interest or estate may be; * * *.
>
> "* * * Similarly, adjustments in respect of capital expenditures or losses, * * * or other items for which the basis is adjustable, are made *without regard to which one of the persons to whom the same uniform basis is applicable makes the capital expenditure or sustains the capital losses,* * * * or to whom the deductions are allowed or allowable." [Emphasis supplied]

█ Furthermore, to rule to the contrary would result, according to the commission argument, in the adjustment being available to the heirs in determining their basis in the proceeds of the estate received by them. These proceeds are money. Applied as argued, this contention would give each heir a basis of $10,000 in his cash distribution of $6,000. This is not the first time that the commission counsel have contended that a taxpayer should have a capital adjustment to cash. Such arguments should be laid to rest quietly but permanently. Their true import is that the taxpayer loses the adjustment entirely, nothing more and nothing less. Such result in this case

would not only be harsh and contrary to the law but also contrary to the commission's own regulation. For a clear criticism of such position, see Brookes, op cit, (12 Tax L Rev at 252-3). In this decision, this court notes but reserves any decision upon the application of the attorneys' fees in the recovery of the cash assets of the trust estate, as the question was not raised or argued.

■ Thus, since the fees were paid by the administratrix, since the attorneys' services resulted in the perfecting of the title which the administratrix received and sold, since such fees properly are chargeable to the capital account, under our broad statute, the commission's regulations, the comparable federal rules and general legal and accounting theory, the administratrix is entitled to adjust her basis in the property to the extent of the fees properly chargeable to this capital account.

## CHARGE TO BASIS OR EXPENSE

■ This case was, unfortunately, submitted upon oral argument of counsel only and not upon written briefs, contrary to the usual practice and rules of this court and at counsels' request. In that oral argument, most of counsels' time was consumed discussing whether the attorneys' fees were deductible as an expense or were an adjustment to basis. Since that argument our Supreme Court in *Sproul v. State Tax Commission*, 234 Or 567, 382 P2d 99, (May 29, 1963), reversing this court, *Sproul v. Commission*, 1 OTR 31, has spoken on the meaning of "ordinary and necessary expense." In that opinion, our court adopted the theory of the lower federal courts which bases the deductibility of an expense not upon the nature of the expense but upon the nature of the conduct of the tax-

payer out of which the expense arose. At 571-2, Mr. Justice O'Connell, speaking for a unanimous court said:

> "* * * The question is, then, whether the manner in which the expense incurred by Sproul in this case was 'ordinary and necessary.'
>
> "* * * it must be determined whether the conduct which generated * * * the consequent expense to plaintiff was ordinary and necessary business conduct. The deduction under ORS 316.305 for 'ordinary and necessary' business expenses is applicable only if the expense is incurred in the course of ordinary and necessary business activity, having in mind the nature of the business and the circumstances under which the expenditure was made. To repeat, it is not enough that the conduct which gives rise to the expense is connected with the business activity. The connection must be such that the conduct can be regarded as an ordinary and necessary incident of the business under the circumstances of the particular case."

In that case the plaintiff who had been acquitted of a murder charge arising out of a dispute over a road necessary to his business sought to deduct the cost of his defense. The shooting had occurred in self defense when he tried to remove a barrier from that road. The circuit court having held his actions to be legal, the court said that legality was not enough, but that the taxpayer's means of accomplishing his business purpose, the removing of the rock barriers from his road, must be "ordinary means of carrying out the business purpose." It held that to remove barriers in the face of armed opposition and threats of death was not such ordinary means.

This decision is a substantial departure from the state of the law at the time that the instant case was

argued. Consequently, this court will not decide whether or not the expense claimed in this case is deductible. In view of the decision already reached, reargument of this point appears unnecessary, as a decision on this point in the plaintiff's favor would arrive at the same result.

## VALUE AT DATE OF DEATH

■ The attorneys' fees are to be added to the original basis of the administratrix in the building to determine her gain or loss upon its sale. That original basis is the value of the interest of Daniel Donohue at the date of his death. This was the basis of the administratrix and of the heirs also. In neither the stipulation upon which the case was submitted nor in the order of the commission which is sought to be set aside is there any direct statement of this value at the decedent's death or of its method of computation. In view of the similarity of the federal statutes and regulations with the state statute and regulations, it is not discernible, for example, whether the commission in its assessment did, or did not apply, the concepts found in IRS Reg § 1.1014-8. In the probate file of the estate of Daniel Donohue, deceased, there are two values at the date of death, one in the inventory and one in the inheritance tax return.

■ In the file of the case of *Daniel v. Donohue, supra,* there are orders for the payment of attorneys' fees out of the trust estate to the attorneys for the Donohue heirs and there is nothing in this record to indicate whether payments made from the trust were, or were not, credited against the contingent fee. If these fees were paid in part out of the trust, there is a question as to the proper amount of the adjustment to the basis.

In order that the value of Daniel Donohue's interest at the date of his death and the exact amount of the properly chargeable attorneys' fees can be computed and considered by the commission, this case will be remanded to the commission, in part under the mandatory provisions of ORS 305.425. However, this court retains jurisdiction to confirm or modify the determination of the commission upon its own motion or upon that of either party as a part of this proceeding and without a de novo retrial of the issues herein decided.