Argued May 6, reversed May 29, petition for rehearing denied
June 25, 1963

# SPROUL ET UX *v.* STATE TAX COMMISSION

### 382 P. 2d 99

*Donald H. Burnett,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Robert Y. Thornton, Attorney General,

and Carlisle B. Roberts, Assistant Attorney General, Salem.

*James R. Moore*, Portland, argued the cause for respondents. On the brief were Mautz, Souther, Spaulding, Kinsey and Williamson, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

O'CONNELL, J.

Plaintiff brings this suit to set aside a deficiency assessment resulting from defendant's rejection of a claimed deduction for expenses incurred in defending a murder charge. Defendant appeals from a decree of the Oregon Tax Court allowing the deduction as an "ordinary and necessary" expense incurred by plaintiffs in carrying on their business. The applicable statute is ORS 316.305 (1), which reads as follows:

"In computing net income there shall be allowed as deductions:

"(1) All the ordinary and necessary expenses, paid during the tax year in carrying on any trade or business, including * * *."

Plaintiffs operate a ranch in Grant county. The operation consists principally of raising cattle, hay and grain. One parcel of plaintiffs' land is contiguous to land which was owned by Harlan Williams prior to his death in 1958. Plaintiffs had used a road over Williams' land since 1938 or 1939. In 1958 Williams piled rocks on that part of the road that was on his land to prevent plaintiffs from using it. When plaintiff, Robert Sproul, learned of Williams' action, he consulted an attorney as to his right to remove the rocks and use the road. He was advised that he had

the right to remove the rock barrier and use the road. Following his attorney's advice, Sproul advised Williams of his intention to exercise these rights. Sproul was warned that if he attempted to do so Williams would kill him. The day after this conversation Sproul sought the advice of another attorney who also told him that he had a right to remove the rock barrier and use the road. Sproul then went to the sheriff of Grant county to discuss the matter. The sheriff was aware of the controversy since he had been told by Williams that the latter would kill Sproul if an attempt was made to use the road. Sproul and the sheriff discussed various methods of settling the dispute, but there appeared to be no feasible way of arriving at an immediate solution. Sproul had discussed with his attorney the possibility of instituting a suit against Williams. Apparently this solution was rejected because it did not appear that the matter could be settled in time to harvest and haul plaintiffs' hay crop before it would be lost. Therefore, Sproul decided to proceed without the aid of the courts. The events that followed are aptly described in the opinion of the lower court:

"* * * [O]n the morning of June 21, 1958, Sproul armed with a Luger pistol and with a rifle in his vehicle, drove out to the road in dispute with the purpose in mind of removing the rock barriers from the road with a Caterpillar tractor and blade, which he had in the northerly field. When he arrived at the field lying south of the Williams property, he found that both Williams and another brother of his wife were there. The testimony showed that his wife had sought the help of her brother in keeping Sproul and Williams from violence. Williams was armed with a rifle and two revolvers. Sproul drove to his boundary fence on the road where it crosses into Williams' property.

He stopped his vehicle, reached in and took out his rifle, and advanced towards Williams. A discussion followed in most heated terms between Williams and Sproul, in which Williams threatened again to kill Sproul if he attempted to remove the rock barriers.

"After this threatening interchange during which the other brother-in-law tried to keep between Sproul and Williams, Sproul backed away toward his truck. He could not swear what his intention in this tense situation was, but he believed that he intended to get into his vehicle, drive around to the Caterpillar across his own property and off the road, get onto the Caterpillar, and then come down the road removing the rock barriers from the road.

"In any event, just as Sproul reached the fence line and lowered his rifle, Williams swung his rifle toward Sproul, and they fired at each other. Sproul could not testify as to who fired first.

"Following the shooting, Sproul was arrested, charged with first degree murder, tried, and acquitted upon a plea of self defense.

"In the testimony elicited by the State Tax Commission some effort was made to show access to the field north of the Williams' property by another road. The testimony showed that it would have required a very circuitous route of over 15 miles to go from one field which was a quarter of a mile along the disputed road from the other field. The state also sought to show that vehicles could be taken off the road and around from one field to another across land owned by Sproul. The testimony is in some conflict, but apparently tractor-type vehicles could make such a trip but at many times of the year tube-tired vehicles could not."

Plaintiffs take the position that Sproul's conduct in resorting to self-help was customary in Grant county as a preliminary maneuver prior to litiga-

tion. Two residents of the county so testified. The question presented is whether the expense incurred in the defense of the murder charge was an "ordinary and necessary" business expense within the meaning of ORS 316.305.

Plaintiffs argue that since the expense arose out of Sproul's assertion of the right to use the road in the course of carrying on his ranching business the expense is deductible. It must be admitted that the expense of defending the charge of murder is connected with Sproul's use of the roadway and in that sense is connected with a business activity. But that does not dispose of the matter. Not all expenses which arise out of the conduct of the taxpayer's business are deductible. A deduction is permitted only if the expense is "ordinary and necessary." The question is, then, whether the manner in which the expense incurred by Sproul in this case was "ordinary and necessary."

Certainly, the expenditure of money for attorneys' fees and other litigation costs incurred in defending oneself on a charge of murder is an "ordinary and necessary" expense as it relates to the defense of the criminal charge. The inquiry must go beyond this for it must be determined whether the conduct which generated the criminal charge and the consequent expense to plaintiff was ordinary and necessary business conduct. The deduction under ORS 316.305 for "ordinary and necessary" business expenses is applicable only if the expense is incurred in the course of ordinary and necessary business activity, having in mind the nature of the business and the circumstances under which the expenditure was made. To repeat, it is not enough that the conduct which gives rise to the expense is connected with the business activity. The

connection must be such that the conduct can be regarded as an ordinary and necessary incident of the business under the circumstances of the particular case.

A shopkeeper who wounds a customer whom he mistakenly thinks is about to rob him could deduct the expense of litigation in an action brought by the customer. But a farmer who uses a spring gun to protect his fruit crop would not be entitled to deduct litigation costs in an action brought by an injured trespasser. In both cases the expense could be described as business connected. But the conduct in one is an ordinary incident of the business and in the other it is so extravagant in relation to the business that it cannot rightly be denominated an "ordinary" or "necessary" expense within the meaning and purpose of the deduction statute.

■ In the instant case we must decide whether Sproul's conduct in choosing to resolve a right-of-way dispute in the manner in which he did can be described as an ordinary and necessary incident of the ranching business. Specifically, the issue arises out of the use of a right-of-way necessary to carry out ranching operations. There could be no question as to the deductibility of litigation expenses if Sproul had sought through an injunction to restrain Williams from interfering with Sproul's use of the way. Clearly deductible also would be the cost of removing the rock barrier from the road. Such expenses would be deductible because in a business involving the use of land and an appurtenant easement resort to the courts to enforce one's rights to use the easement or the costs incurred in removing physicial obstructions are ordinary means of carrying out the business purpose. On the other hand, the expense of defending a criminal

charge would clearly not be deductible if, without any threat of danger from Williams, Sproul had shot Williams down without warning because of Williams' obstruction of the way. And this would be true aside from any consideration of the anti-social character of the means used by Sproul to assert the claimed right. The expense would not be deductible because the manner of asserting the right could not be regarded as an ordinary and necessary business activity under the circumstances.

The same would be true if Sproul and Williams had met in town and in the heat of argument over the use of the road Sproul had shot Williams in self-defense. Such a manner of settling a dispute relating to the business use of property is not "ordinary and necessary," if those words are to be given their common meaning. Does the case become any different if the dispute is settled in the same manner but in the course of actually using the claimed right-of-way? We think not, unless the need to make use of the road was so urgent in a business sense that Sproul's forcible assertion of his right could be regarded as an ordinary means of carrying on the business of ranching.[1]

Implicit in the lower court's opinion in this case is the idea that if Sproul's use of self-help had been resorted to in the face of danger and if it was done when peaceful avenues of settlement had not been fully

[1] Where the taxpayer does not voluntarily place himself in the situation which results in the charge made against him, the expense is unavoidable and if it arises out of the transaction of the taxpayer's business it is deductible. Thus, where a branch manager in charge of soliciting magazine subscriptions was charged with assault with intent to rape a prospective saleswoman while interviewing her at her home, the expense of defending the criminal charge was held deductible. John W. Clark, 30 T C 1330 (1958). But see, Pantages Theatre Co. v. Welch, 71 F2d 68 (9th Cir 1934); George L. Rickard, 12 B T A 836 (1928).

574

explored and exhausted, the deduction would not be allowable. This is a recognition that conduct in the very process of carrying out a business purpose may be so out of relation with the business end sought to be accomplished that it cannot be regarded as "ordinary" or "necessary."[2]

We do not agree with the trial judge's conclusion that Sproul faced a situation in which "the whole matter could have been expected to reach some settlement after a satisfactory exchange of angry words, threats and irritating actions * * *." We do not think that Sproul's conduct in asserting his claimed right to use the road was made with the expectation of a peaceful "settlement." Sproul had the warning both from Williams personally and from the sheriff of Grant county that Williams would kill him if an attempt was made to use the road. Sproul accepted the challenge. He armed himself in preparation for a possible gun fight. His testimony, reasonably interpreted, indicates that he set out to use the way with the intention to use force if he met resistance. Even after he had

[2] The lower court said: "Certainly Sproul was concerned by the threats. He first clearly established his legal position. Then he sought out the Sheriff for help. These are not the acts of a head-strong battler. He took the recognized course of self-help only after exhausting the other remedies available before he needed to prepare for haying. Furthermore, Williams apparently had no general reputation for violence. He was Sproul's brother-in-law and would be thought to be less likely than a stranger to take the life of his sister's husband. He could be expected to stand up to Sproul, perhaps even engage in a fist fight, but using his firearms in the ultimate seemed unlikely. As Kilpatrick testified, it was usual for Grant County people to try out each other's resolve before resorting to the courts. Both Sproul and Williams expected such a mutual testing of intentions and resolutions. Dire threats of physical violence to emphasize this resolve were commonplace. Thus, in the customs of Grant County the whole matter could have been expected to reach some settlement after a satisfactory exchange of angry words, threats, and irritating actions, had Williams not swung up his rifle."

encountered resistance from Williams and was retreating to his own land he had the intention of returning immediately in the face of the then imminent danger. This is disclosed in the following testimony:

"Q. In other words, you were going to go around the fence line on your property on foot, get your tractor and come back on the road where the rocks were?

"A. That was my intentions, but of course, a person thought of everything."

We do not think that conduct of this kind can be regarded as the ordinary manner of settling a business dispute of this character. Sproul had a choice of using the ordinary means of asserting his right through the aid of the courts, or more immediately by calling for the assistance of the state or local police. He chose to settle the matter through self-help in a setting bustling with danger. When he made that choice he elected to use a method of settling the dispute which was completely alien to the ordinary manner in which business disputes are resolved. In short, Sproul chose to make the matter a personal one to be resolved by personal combat as much so as if the parties had decided to select another time and place for their duel over the right-of-way.[9] The business element then

___

[9] The instant case is not unlike the case of B. W. Sturdivant, 15 T C 880 (1950). In that case a partnership entered into a contract to clear land in return for wood thereon. The landowner, however, turned away the wagons sent to get the wood on the ground that they were tramping down his corn. Later in the day insulting words were exchanged and a fist fight broke out between one of the partners and the landowner. After unsuccessful attempts by two partners to locate friends to intercede in the feud, the partners and an employee went out fully armed. They stopped at a gas station where a gun fight occurred between them and the landowner. The latter was killed. The partnership tried to deduct legal fees paid in the defense of a murder trial and the

was no longer a substantial factor in the method selected for settling the dispute and the expense flowing from the incident can not be regarded as an ordinary business expense.[④]

settlement of a civil suit. The deduction was disallowed. The court said, at page 885: "It cannot be said that settlement of a dispute or defense of honor in this manner was ordinary to this business or business in general."

Although in the Sturdivant case the acts of violence did not occur at the very time the right was asserted, that fact would not seem sufficient to distinguish it from the present case.

[④] Some of the cases discuss the problem in terms of proximate cause. Thus in Sarah Backer et al., Executors, 1 B T A 214, 217 (1924), the taxpayer was refused a deduction for expenses in defending against a perjury charge where the perjury was committed to prevent retaliation by labor leaders against the taxpayer's construction business. The court said:

"* * * The question is whether the act whereby he laid himself open to the charge of perjury was one which was ordinarily and necessarily committed in the course of his business. We are unable to see any proximate connection between the two."

In Citron-Byer Co., 21 B T A 308, 311 (1930), the taxpayer was allowed a deduction for expenses involved in the defense of a charge of conspiring to defraud the government by accepting a better type of wire from the government than it had purchased at a governmental auction. The court said:

"* * * If the fees were paid in defense of an action or proceeding directly connected with and proximately resulting from the ordinary and proper conduct of the taxpayer's business, they are ordinary and necessary expenses of the business and deductible as such."

Similarly, in Kornhauser v. United States, 276 US 145, 153, 48 S Ct 219, 72 L Ed 505 (1928), where a deduction was allowed one partner for defense expenses in a suit brought by his co-partner to make the taxpayer account for fees received, it is said:

"The basis of these holdings seems to be that where a suit or action against a taxpayer is directly connected with, or, as otherwise stated (*Appeal of Backer*, 1 B T A 214, 216), proximately resulted from, his business, the expense incurred is a business expense within the meaning of § 214 (a) subd. (1), of the act. These rulings seem to be sound * * *."

In accord with this position are John Stephens, 2 B T A 724 (1925) and Walter S. Dickey, 14 B T A 1295, 1309 (1929).

The defendant argues that the claimed deduction should not be allowed for an additional reason. It is urged that to permit a deduction under these circumstances would encourage the use of self-help in the resolution of disputes and thus frustrate the policy favoring peaceful settlements through the orderly courses provided by law. We do not choose to rest our decision on this ground.[6]

The decree of the lower court is reversed.

SLOAN, J., specially concurring.

I concur in the opinion filed. However, I think attention should be directed to and emphasis given

---

[6] Public policy has been used to aid in the determination of what is an ordinary and necessary business expense but the precise limits of its use are not clear. The United States Supreme Court defined the scope of the use of public policy in Commissioner v. Heininger, 320 US 467, 473, 64 S Ct 249, 88 L Ed 171 (1943). It said:

"The Bureau of Internal Revenue, the Board of Tax Appeals, and the federal courts have from time to time, however, narrowed the generally accepted meaning of the language used in § 23 (a) in order that [there would not be a] tax deduction [where the result would be to] frustrate sharply defined national or state policies proscribing particular types of conduct."

This test was applied in Jerry Rossman Corporation v. Commissioner of Int. Rev., 175 F2d 711 (2d Cir (1949)).

In Lilly v. Commissioner, 343 US 90, 97, 72 S Ct 497, 96 L Ed 769 (1951) the Supreme Court cast doubt upon the basic validity of the "frustration of a sharply defined national or state policies" test, but indicated that if such is the test, "The policies frustrated must be national or state policies evidenced by some governmental declaration of them." If this is interpreted as requiring a legislative determination of the policy which would be frustrated by permitting a deduction, the requirement would seem to be stated too narrowly in view of the fact that in many cases judicially announced policy is equally in need of recognition through the denial of a tax deduction. But see Comment, 20 U Cinn L Rev 524 (1951); Note, 54 Harv L Rev 852 (1941); Krassner, Can A Deduction for Legal Fees be Against Public Policy?, 26 Taxes 447 (1948) suggesting public policy should not be used at all in making the determination.

two recent decisions of the Supreme Court of the United States. *U. S. v. Gilmore,* decided February 18, 1963, 31 LW 4207 and *U. S. v. Patrick,* decided the same day and now found at 31 LW 4211. These cases bring into much sharper focus the precise basis for denying the deduction of legal costs in this and other forms of litigation. The opinion filed here is sufficient for the case at hand. But this kind of case, it is to be hoped, will be rare. The *Gilmore* and *Patrick* cases, although each arose from divorce proceedings, provide a more distinct answer to this case and to the more commonplace questions that arise in income tax problems of this nature.